UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

REBECCA J. BAKER,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )     No. 2:05 CV 16    ERW
                                     )                       DDN
JO ANNE B. BARNHART,                 )
Commissioner of                      )
Social Security,                     )
                                     )
            Defendant.               )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Rebecca J. Baker for disability insurance benefits and supplemental security income benefits based on disability under Title II, 42 U.S.C. §§ 401, <u>et. seq.</u>, and Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, <u>et seq</u>.  The action was referred to the undersigned United States Magistrate Judge for a recommended disposition under 28 U.S.C. § 636(b).

**I. Background**

**A. Application and Medical Records**

In an application for benefits dated January 10, 2002, plaintiff alleged a disability onset date of August 15, 2001. (Tr. 114, 117.) She alleged she had a nerve disorder, carpal tunnel syndrome, a neck injury, feet injuries, degenerative arthritis, tendinitis, panic attacks, and a stomach disorder that prevented her from working. (Tr. 143.)

Plaintiff reported that her conditions cause her pain, and that they first began to bother her on March 31, 2000.  She became unable to work on August 15, 2001.  She reported that prior to leaving her job, her conditions required her to work fewer hours, change her job duties, and make other job-related changes.  She reported her doctors ordered no overtime, her work station was changed to accommodate her, and her panic attacks and medication caused her to miss work.  Plaintiff reported she quit working because she was terminated due to absenteeism stemming from her disabilities. (Tr. 143.)

Plaintiff reported working as a factory assembler from October 5, 1998 until August 2001. She worked over nine hours a day, five days per week. She would stand in one spot, feeding material through a sonic welder. She would stand for nine hours, kneel for 30 minutes, and handle large and small objects for nine hours per day. Plaintiff reported that the heaviest weight she lifted was 50 pounds, and that she frequently lifted 10 pounds. (Tr. 144.)

Plaintiff reported working as a cashier at Wal-Mart from April 1995 until February 1998. She reported walking more than six hours per day, standing for more than three hours, climbing, kneeling, and crouching for one hour, crawling for a half hour, handling large objects for six hours, and writing or handling small objects for four hours. The heaviest she would lift was 50 pounds, and she frequently lifted 25 pounds. (Tr. 156, 158.)

From February to September 1998, plaintiff reported working as a bartender. She would walk for five hours, stand for five hours, handle large and small objects for five hours, crouch for one hour, and stoop for one hour. The heaviest she would lift was 100 pounds, and she lifted 50 pounds frequently. (Tr. 156, 159.)

In a pain questionnaire completed by plaintiff, she reported that her feet, knees, hands, fingers, neck, shoulders, low back, head, and ankles cause her pain constantly. She states this pain is present whenever she is standing, walking, lifting, writing, grasping small objects, and grasping large objects. She alleged this pain has limited her activities for two years. She reported that she tries to move and stretch to relieve the pain, and takes medications, but these remedies only help briefly. (Tr. 164.)

Plaintiff reported that the Ibuprofen[1] that she takes for her pain aggravates her stomach condition. Plaintiff reports that she is unable to take care of her farm and animals due to her conditions. She prepares meals, but finds it difficult to hold a knife to peel vegetables. She does have difficulty standing in one place to wash dishes, and cannot knead bread, which she used to make from scratch. She reported being unable to shop because she cannot hold many bags at a time and cannot carry heavy items. (Tr. 165-66.)

---

[1]Ibuprofen is a nonsteroidal anti-inflammatory drug used to treat pain and swelling. Webmd.com/drugs. (Last visited Feb. 28, 2002.)

From September 12, 2000, until her discharge on December 21, 2000, plaintiff underwent physical therapy for her shoulder and feet at Peak Performance. Plaintiff complained of plantar pain and pain in her elbow and metacarpal area, which increased with work and decreased when she rested. She was to undergo physical therapy two to three times a week for two or three weeks, and to apply a hot or cold pack to the area. On September 18, 2000, plaintiff was told to wear temporary orthotic construction and splint fabrication daily and at night. She was to continue applying hot or cold packs to the painful areas. Several times she underwent electrical stimulation. It was noted she was tolerating therapy well, that she was making good progress and was compliant with both the in-house and home programs. On November 29, 2000, plaintiff was discharged from her physical therapy program, and the therapist noted plaintiff said her knees felt better, but that her fingers still experienced tingling. (Tr. 194-211.)

On September 15, 2000, plaintiff visited Jennifer Clark, M.D., complaining of hand, arm, and foot pain. Dr. Clark noted that if there was no modified work available for plaintiff, she would be unable to work. Dr. Clark stated that plaintiff could return to work if she did not work overtime. Dr. Clark diagnosed plantar fasciitis[2] and tendinitis in the hands and arms. (Tr. 225-26.)

On November 27, 2000, plaintiff visited Tan Nguyen, M.D., who prescribed Prevacid[3] for plaintiff's stomach problems. This prescription was refilled on December 5 and December 12, 2000. (Tr. 236.)

On December 28, 2000, plaintiff complained to Dr. Nguyen that she had been feeling depressed lately. Plaintiff had been taking over-the-counter medication to help her feelings. (Tr. 236.)

On January 5, 2001, Dr. Clark recommended physical therapy, occupational therapy, and splinting for plaintiff's arm and knee pain. On January 19, 2001, Dr. Clark noted plaintiff had tendinitis and

---

[2]Plantar fasciitis is a condition that causes heel pain. The plantar fascia is a band of tissue that connects the heal bone to the toes and can become strained, resulting in tears that irritate the area. Webmd.com/hw/foot_problems/hw114460.asp. (Last visited Feb. 28, 2006.)

[3]Prevacid is used to treat acid related stomach problems by blocking the production of acid in the stomach. Webmd.com/drugs. (Last visited Feb. 28, 2006.)

overuse, brought on by her work duties. Dr. Clark prescribed Flexeril[4] and splints, and told plaintiff not to work overtime. (Tr. 227-29.)

From February 15, 2001 until her discharge on July 16, 2001, plaintiff again participated in physical therapy at Peak Performance. Plaintiff complained of knee pain and elbow tendinitis. She received treatment to improve strength, joint mobilization, general conditioning, and flexibility. Plaintiff reported some stiffness in those areas and thought she would benefit from stretching. Plaintiff was told to apply a hot or cold pack to her painful areas, and it was noted she tolerated therapy well. She was discharged with instructions to participate in a home program. Plaintiff felt her wrist and postural problems had improved, although she still felt some wrist pain and fingertip numbness. (Tr. 212-24.)

On March 1, 2001, plaintiff visited Dr. Nguyen. She reported falling at work on February 27, 2001. After the fall, plaintiff reported neck pain, and reported that now her neck was stiff and she had trouble turning her head. Plaintiff had muscle spasms in her shoulder. Dr. Nguyen prescribed Ibuprofen and Flexeril. He gave her an excuse to miss work over the weekend. (Tr. 236-37.)

On March 9, 2001, Dr. Nguyen re-examined plaintiff after her neck injury. Plaintiff reported her neck was still painful. An x-ray of her cervical spine did not show a fracture. Medication only gave her partial relief. He recommended that plaintiff wear a collar for a week and prescribed Flexeril. (Tr. 237-38.)

On March 21, 2001, plaintiff visited Dr. Clark. Dr. Clark recommended physical therapy, aerobic exercise, and home exercise. Plaintiff's goals were to increase strength, function, flexibility, and range of motion. Dr. Clark opined that if no modified work was available for plaintiff, she would be unable to work. Dr. Clark also opined that plaintiff could return to work, but should do no work at or above the shoulder level, not lift over 10 pounds, and not push more than 50 pounds. (Tr. 230-31.)

On March 23, 2001, plaintiff visited Dr. Nguyen. She complained of nasal congestion, cough, and a sore throat. She also complained of chest

---

[4]Flexeril is a muscle relaxant used to treat muscle pain and spasms. Webmd.com/drugs. (Last visited Feb. 28, 2006.)

pain.  Over-the-counter medication had been helping her symptoms.  (Tr. 239.)

On April 3, 2001, plaintiff visited Dr. Clark.  Dr. Clark stated that plaintiff was able to return to work without restrictions.  Dr. Clark recommended physical therapy, modalities, cervical traction, scapular stabilization, aerobic exercise, and a home exercise program. Plaintiff's goals were to increase her range of motion, strength, function, and flexibility, and to decrease her pain.  (Tr. 232-33.)

On June 17, 2001, plaintiff visited Dr. Clark.  Dr. Clark noted plaintiff was able to work with no limitations, except for no overtime. Plaintiff was to be re-evaluated at a later time to see if she was tolerating work well.  (Tr. 234.)

On July 10, 2001, plaintiff visited Dr. Nguyen, complaining of an insect bite and tongue lesions.  Plaintiff was undergoing a lot of personal stress, including a divorce and her father having health problems.  She stated she felt anxious most of the day and had insomnia, decreased concentration, decreased interest, decreased appetite, but denied feeling suicidal or homicidal.  She appeared alert and oriented. Dr. Nguyen advised her to keep the possible insect bite clean and dry and to watch for changes.  She was to undergo stress management and he prescribed Paxil[5] and Klonopin.[6]  (Tr. 241.)

On July 24, 2001, plaintiff visited Dr. Nguyen.  She complained of numbness and tingling in both hands.  Plaintiff reported occasionally feeling disoriented and nauseous.  She reported her depressive and anxious symptoms had improved with her use of Paxil.  She still felt stiffness and pain in her neck, but she had full range of motion in her neck.  She was alert and oriented and in no acute distress.  Dr. Nguyen opined plaintiff had carpal tunnel syndrome, and encouraged her to wear wrist splints, especially at night and during the day if it did not impede her work.  She was advised to rest and avoid repetitive movements in her hands.  She was to continue taking Paxil.  (Tr. 242-43.)

_____

[5]Paxil is a selective serotonin reuptake inhibitor (SSRI) used to treat depression, panic attacks, obsessive-compulsive disorder (OCD), social anxiety disorder, post-traumatic stress disorder, and generalized anxiety disorders.  Webmd.com/drugs.  (Last visited Feb. 28, 2006.)

[6]Klonopin is used to treat seizure disorders and panic attacks. Webmd.com/drugs.  (Last visited Feb. 28, 2006.)

On August 3, 2001, plaintiff visited Dr. Nguyen. She complained of depression and anxiety, but felt she had improved slightly with the use of the medication. She reported being fired from her job due to attendance issues. She denied depressive or gross anxiety. She denied feeling of numbness or tingling in her hand. She was encouraged to maintain a stress management program. Plaintiff felt things would be better when she got a new job. (Tr. 243.)

On August 28, 2001, plaintiff visited Dr. Nguyen. Plaintiff complained of swollen neck glands and nasal congestion. She requested a refill of Paxil. She reported a lack of interest and lack of concentration, and stated she becomes tearful and feels hopeless. She was diagnosed with sinusitis, tension headaches, and depression and anxiety. She was prescribed Paxil. (Tr. 244.)

On October 18, 2001, plaintiff visited Raymond F. Cohen, D.O., complaining of pain in both hands, wrists, her elbows, arms, feet, knees, and neck. Dr. Cohen diagnosed plaintiff with overuse disorder, bilateral epicondylitis,[7] and bilateral carpal tunnel syndrome,[8] all relating to her work. Dr. Cohen found she had intention tremors[9] in her upper extremities, and a prior wrist trauma. He opined the conditions were work related injuries. He opined she should be restricted from repetitive work, that she had a 15 percent partial permanent disability of her left foot, a 15 percent partial permanent disability of her right foot, a 20 percent partial permanent disability at the left wrist, a 25 percent permanent partial disability of her right wrist, a five percent permanent partial disability of her left elbow, a five percent permanent

---

[7]Epicondylitis, or tennis elbow, is a term used to describe pain on the outside part of the elbow, caused by damage to the tendon in the elbow. Webmd.com/hw/arthritis/tr1936-medinfo.asp. (Last visited Feb. 28, 2006.)

[8]Carpal tunnel syndrome includes symptoms such as tingling, numbness, weakness, or pain in the fingers, thumb, hand, and occasionally in the arm. These symptoms occur when there is pressure on the median nerve within the wrist. Webmd.com/hw/carpal_tunnel/hw213311.asp. (Last visited Feb. 28, 2006.)

[9]Intention tremors is a nerve disorder characterized by uncontrollable shaking in different parts and on different sides of the body. Webmd.com/content/article/117/112474.htm. (Last visited Feb. 28, 2006.)

partial disability of her right elbow, and a 15 percent permanent partial disability of the whole person.  (Tr. 250-53.)

On November 16, 2001, plaintiff visited Dr. Nguyen, complaining of hot and cold flashes, and upset stomach.  Plaintiff had notable weight gain.  Plaintiff worried she might be pregnant, but her pregnancy test was negative.  She was told to not eat spicy, fatty foods.  Plaintiff reported bruising easily.  (Tr. 246.)

Plaintiff visited Dr. Nguyen on December 27, 2001.  She complained of nasal congestion, sore throat, and sinus pressure.  She was diagnosed with bronchitis and allergic rhinitis.  (Tr. 246-47.)

On January 10, 2002, Angela Huwar noted that plaintiff's hands were shaking, and that it appeared she was trying to hold them still.  She opined that plaintiff appeared to have difficulties using her hands. (Tr. 154-55.)

On February 26, 2002, plaintiff was examined by Ruthie Moccia, Ed.S, a licensed psychologist.  Plaintiff told Dr. Moccia that she had previously used drugs, and currently abused alcohol and had used cannabis within the last month.  Plaintiff stated that she thought her depression was caused by an overindulgence in cocaine in July 2001.  Plaintiff reported feeling "fine."  She appeared oriented to time, place, and person.  She was able to follow directions, recall dates, and her memory seemed intact.  Dr. Moccia thought plaintiff had sincere but cynical responses to questions.  She reported driving her boyfriend to his probation officer meetings because he has no license, and drives her children to places as needed.  (Tr. 259-60.)

Dr. Moccia noted that plaintiff was alert and oriented, and had good concentration, memory, and ability to follow directions.  Plaintiff felt her anxiety was due to substance abuse, but that these were subsiding. She had some episodes of depression.  Plaintiff was diagnosed with a GAF of 50,[10] indicating serious symptoms.  (Tr. 260-65.)

On March 11, 2002, Paul Stuve, Ph.D., performed a psychiatric review technique on plaintiff.  He opined plaintiff did not have a severe impairment.  He opined she had affective disorders, anxiety related

_____

[10]Global Assessment of Functioning score of 50 means the plaintiff would have "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning . . .."  Diagnostic and Statistical Manual of Mental Disorders 34 (Fourth Ed., 2000).

disorders, and substance addiction disorders. He diagnosed depression, because plaintiff suffered from a depressed mood. He opined she suffered from substance-induced anxiety disorder, because she had some panic attacks. Dr. Stuve opined that plaintiff had no restrictions on her daily living activities, and only mild limitations on her social functioning and ability to maintain concentration, persistence, or pace. Dr. Stuve noted plaintiff reported drinking a fifth of whiskey a day if she could afford it, and had a history of substance abuse. He noted that her consumption of that much liquor would certainly affect her ability to remain employed. Dr. Stuve noted that without her substance use, her mental impairment was not severe. (Tr. 266-78.)

On March 12, 2002, Scott C. Crane completed a physical residual functional capacity assessment on plaintiff. He opined plaintiff could lift 20 pounds occasionally, and 10 pounds frequently. Plaintiff was able to stand or walk for six hours, and sit for six hours in an eight-hour workday. She was unlimited in her ability to push or pull. Plaintiff could frequently climb, stoop, balance, kneel, crouch, and crawl. She could occasionally climb ladders, ropes, or scaffolds. Plaintiff was limited in her ability to finger, but unlimited in her ability to reach in all directions, handle, and feel. She had no visual, communicative, or environmental limitations. (Tr. 280-88.)

On February 13, 2003, plaintiff was seen by Lori Byrd, a social worker. Plaintiff complained of depression and that it felt like she was "itching" all over. Plaintiff was shaking constantly. She had no suicidal thoughts. Plaintiff reported being abused by her former husbands, and now her children were "out of control." Plaintiff reported having panic attacks. (Tr. 289-91.)

February 20, 2003, Lori Byrd noted that plaintiff's friendships are based on abuse and alcohol and usually do not last long. She had gained a significant amount of weight. Plaintiff always took care of herself and always had a different hairdo. Byrd opined plaintiff had a poor ability to concentrate, and quit college due to her mental illness. Plaintiff complained of a high and low feeling and thought she may have bipolar disorder. Plaintiff reported shaking and feeling as though she were itching. She complained of mood swings. Plaintiff has little family or community support. Byrd felt plaintiff should be evaluated for bipolar disorder. (Tr. 299-303.)

On March 11, 2003, plaintiff visited Nemesio Gutierrez, M.D., complaining of depression. She reported being depressed for five or six years. She was prescribed Paxil and Gabitril.[11] (Tr. 293-94.)

On April 8, 2003, plaintiff visited Dr. Gutierrez and was diagnosed with major depressive disorder. She appeared calm and relaxed at the appointment, and stated that she felt "drugged up." Dr. Gutierrez felt it was the Gabitril that caused this feeling. Plaintiff reported her moods had improved. (Tr. 296.)

On May 8, 2003, plaintiff visited Dr. Gutierrez. She reported that her "drugged up" feeling went away when she stopped taking Gabitril. Plaintiff reporting snapping at others frequently. Her mood was better, and she was slightly depressed. She was diagnosed with major depressive disorder. She was prescribed Trazodone[12] and Paxil. (Tr. 297-98.)

On May 22, 2003, plaintiff visited Lori Byrd. Byrd opined that plaintiff had mental illness, anxiety, and depression. She suffered from mood swings. Byrd opined that plaintiff had a poor ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stress, function independently, and maintain concentration. Byrd also thought plaintiff had a poor ability to understand, remember, and carry out both complex, detailed, and simple job instructions. Byrd opined that plaintiff had a poor ability to maintain her personal appearance, behave in an emotionally stable manner, relate in social situations, and demonstrate reliability. (Tr. 304-05.)

On June 19, 2003, plaintiff visited Hope I. Tinker, M.D. Dr. Tinker opined that plaintiff was alert and oriented, with tremors in her shoulder, hands, and neck. She diagnosed plaintiff with marked tremors, and noted that she had a history of GERD,[13] an ankle sprain, and anxiety and depression. (Tr. 307-08.)

---

[11] Gabitril is used to control epileptic seizures. Webmd.com/drugs. (Last visited Feb. 28, 2006.)

[12]Trazodone is used to treat depression. Webmd.com/drugs. (Last visited Feb. 28, 2006.)

[13]GERD, or gastroesophageal reflux disease, is caused when acid refluxes from the stomach into the esophagus, causing chronic heartburn. Webmd.com/content/article/75/89790.htm. (Last visited Feb. 28, 2006.)

On July 1, 2003, plaintiff visited Dr. Tinker. Plaintiff had reduced her dose of Paxil with no difficulty. Plaintiff was having problems sleeping. Dr. Tinker noted her arms were shaking. She further reduced her dose of Paxil. Dr. Tinker completed a medical source statement, and opined that plaintiff would be in pain if she carried up to five pounds. She thought plaintiff could stand or walk for five minutes, and sit for two or three hours. She opined she was unlimited in her ability to push, but was limited when pulling. Dr. Tinker opined plaintiff could occasionally climb, stoop, kneel, crouch, and bend, and could frequently balance. She found her abilities to reach, see, hear, and speak were unlimited, but she was limited in her abilities to handle, finger, and feel. He noted she should not be around machinery because noise makes her irritable, that she has hot flashes, and that dust would make her sneeze. Dr. Tinker thought it would be necessary for plaintiff to assume a reclining or supine position for up to 30 minutes, one to three times per day, to control her pain and fatigue. Dr. Tinker noted that she treated her for about two weeks for tremors, mood disorder, a urinary tract infection, and back pain. (Tr. 309-14.)

On September 9, 2003, Dr. Gutierrez noted that plaintiff had difficulty getting along with others, and snaps at people easily. He noted she suffered from depression and anxiety. He opined she would have a fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, function independently, and maintain concentration. He thought her ability to deal with work stress and interact with supervisors would be poor. He thought she had a good ability to maintain personal appearance and with reliability, but was fair when behaving in an emotionally stable manner and relating in social situations. (Tr. 315-16.)

On December 1, 2003, plaintiff visited Dr. Tinker, complaining of back pain and diarrhea. Plaintiff was sleeping better. She was experiencing no neck pain, and her low back was not tight. Plaintiff wanted to see a psychologist and reported crying a lot. Dr. Tinker noted plaintiff had a history of depression and anxiety. (Tr. 319.)

On February 9, 2004, plaintiff visited Dr. Tinker. Plaintiff stated she felt less irritable. Plaintiff complained that she was biting her fingers, had itchy skin, and jittery feelings. Her back, ankles, and shoulders hurt. She had some resting tremors, but appeared less nervous

than other visits. She was diagnosed with a hyperthyroid condition, bronchitis, obesity, and Dr. Tinker noted she had a history of depression, anxiety, and tremors. (Tr. 320.)

On April 28, 2004, Eddie W. Runde, M.D., an occupational and environmental physician, performed a consultive examination of plaintiff. After a physical exam, Dr. Runde noted plaintiff was cooperative. She was capable of dressing and getting on and off the table without assistance. He noted she was morbidly obese. Plaintiff had a full range of motion in her spine, and had no tenderness in her shoulders. She was able to make a fist, and do fine finger movements by rapidly moving her fingers sequentially. She had a tremor in both hands, but her right hand was worse. Her upper extremity strength was normal, and she had tenderness in her right wrist. Plaintiff appeared depressed and flat, and was sighing, groaning, and grunting during the exam. Dr. Runde diagnosed low back pain, bilateral knee pain, possible osteoarthritis, depression, familial tremors, and morbid obesity. (Tr. 322-24.)

Dr. Runde found that plaintiff could lift up to 50 pounds occasionally, and 20 pounds frequently. He opined she could stand or walk for two hours in an eight-hour workday, and sit for six hours. He found she was unlimited in her ability to push or pull, could frequently climb and balance, and could occasionally kneel, crouch, crawl, and stoop. Plaintiff was unlimited in her ability to reach in all directions, handle large and small objects, and feel, and had no environmental limitations except for humidity or wetness. (Tr. 325-28.)

## B. Testimony of Plaintiff

At a hearing held on May 28, 2003, plaintiff testified that she was five feet six inches tall and 300 pounds. She testified she had two children and that she lived with them, her boyfriend, and his son. Plaintiff testified that she was able to drive. (Tr. 34-35.)

Plaintiff testified that she had completed one year of college. Her last job was at BHA and she operated a sonic welder. She reported that the heaviest objects she was required to lift were 10 pounds. She stood, but eventually, because of her condition, she was allowed to sit and BHA even modified a machine so that she could work while sitting. She did the modified work for six months to one year. Before that job, she worked for one year as a cashier at Wal-Mart. At that job, she had to

lift ten to twenty pounds.  Before working as a cashier, her jobs were sporadic, with periods where she did not work.  (Tr. 36-39.)

Plaintiff testified that she quit working because she suffered from carpal tunnel syndrome, neck and back injuries, and tremors.  Plaintiff testified she was currently being treated for a nerve disorder which caused her tremors, and panic attacks.  She testified she had been suffering from tremors since she was 15.  (Tr. 39-40.)

Plaintiff testified she was unable to stand for long periods of time due to foot pain, which was caused by spurs on her feet.  She testified that she has a hard time walking after sitting or lying down.  She testified that she uses a cane because she twisted her ankle, and that it was weak and often twists when she walks without a cane.  No doctor prescribed the cane.  (Tr. 41.)

Plaintiff testified that she suffers from a stomach disorder.  She testified that she has heartburn and constant burning, like acid reflux. (Tr. 42.)

Plaintiff testified that she has panic attacks two or three times a week.  She yells at her family when having a panic attack, because they stand close and try to help her and she needs room to breath.  During these attacks, she blacks out, is anxious, and loses control.  They usually last five minutes.  (Tr. 42-43, 47.)

In a typical day, plaintiff testified that she sleeps late but thinks it is because of her medication.  She takes her medication after waking, and then uses the computer.  She goes outside but cannot stoop, and goes to the barn to make sure that the animals are all right.  She cannot do anything for them.  Her children do the laundry and dishes. She still does the grocery shopping, but must lean on the cart.  She drives, and is the only one in her family with a driver's license.  (Tr. 43-44.)

Plaintiff testified that the heaviest weight she can lift is four pounds.  She frequently drops things.  She has no grip, and is unable to tie her shoes well or write.  (Tr. 44-45.)

Plaintiff testified that in the past, she used cocaine, crack, and marijuana.  She quit using these drugs when she met her boyfriend, and has not used drugs since September 2001.  Plaintiff drinks homemade wine, which she still makes as a hobby.  She said she drank because it helped her nerves and shaking, but she does not drink much now.  (Tr. 45-47.)

Plaintiff testified that she has problems sleeping at night. She often stays up late and sleeps late as a result. She often cries because of her depression. She is depressed one or two days a week. She talks to her animals to help her depression. (Tr. 47-49.)

At a hearing held on March 8, 2004, plaintiff testified that she lives with her boyfriend and their children. She testified her boyfriend drove her to the hearing, which was held about 30 miles from her home. She testified that she does drive. (Tr. 336.)

Plaintiff testified that she graduated high school and went to one year of college. She testified that at her last job, at BHA, she operated an industrial glue gun, a rivet gun, and industrial sonic welders. She characterized this work as assembly line work. This work required her to stand in one spot, and that she was required to lift 60 to 100 pounds. She worked there for two years, leaving in 2001 after being fired. She was fired because she was often absent from work, and testified that the medication she was taking made her groggy and have panic attacks. Before working at BHA, plaintiff worked at Wal-Mart as a cashier. She would help unload trucks as well. She worked there for two years, until she was fired for missing work due to doctor's appointments. (Tr. 336-39.)

Plaintiff testified that she is unable to work because she is unable to stand for more than five minutes at a time, and that she can only sit for 30 minutes before she needs to get up and move around. She testified her legs cramp up a lot, that she is unable to lift more than five or 10 pounds, and that she is unable to do any detail work because of her nerves. She also testified she cannot work because her mood swings have a tendency to repel people. (Tr. 339-40.)

Plaintiff testified that she was seeing a psychologist, Dr. Gutierrez, but that he moved to an office over an hour and a half away so she quit seeing him. Since then, she had not seen a psychologist, but that when she is feeling depressed she gets on the internet and talks to a stranger, and she testified that hearing other people's problems make her forget about her own. (Tr. 342.)

Plaintiff testified that at the time of the hearing, she was taking Wellbutrin,[14] Clonazepam [Klonopin], Inderal,[15] Protonix,[16] Extra-strength Tylenol, and Bextra,[17] but she was unsure why she took some of the medication. (Tr. 340-44.)

Plaintiff testified that she spent her days sleeping until her boyfriend comes home from lunch at noon. She then makes the bed, and picks up the living room. She does the laundry, but cannot carry the wet laundry to the dryer, which is six feet away, because it is too heavy. She does not leave her home much anymore, and does not belong to any social groups. She is not close to her family. She does use the internet about once per day. She chats and uses e-mail. She also likes to read gardening magazines and romance novels. She takes care of her cockatiels. After her boyfriend and kids get home, she watches television. Plaintiff testified that she wears slip-on shoes, and sweats. She cannot get in and out of the bathtub, but, if she takes her time, she can dress herself. (Tr. 345-48.)

Plaintiff testified that she uses a cane, but that no doctor prescribed it for her. She testified that she mostly uses it when she has to leave the house. (Tr. 348-49.)

Plaintiff testified that she takes no trips and is not very social. Her doctor told her to go to a gym to work out, but she had a hard time doing what they wanted her to there. She testified she was unable to put on the supportive shoes required to work out. She had not asked anyone to help her put on the shoes. (Tr. 349.)

Plaintiff testified that she helps her children with their homework. She does not participate in a home exercise program. She tries to watch what she eats but feels it does not make any difference. She tries to

---

[14]Wellbutrin is used to treat depression. Webmd.com/drugs. (Last visited Feb. 28, 2006.)

[15]Inderal is used to treat chest pain, high blood pressure, irregular heart beats, migraine headaches, and tremors. Webmd.com/drugs. (Last visited Feb. 28, 2006.)

[16]Protonix blocks acid production in the stomach. Webmd.com/drugs. (Last visited Feb. 28, 2006.)

[17]Bextra is a nonsteroidal anti-inflammatory drug used to relieve pain and swelling. It is used to treat arthritis. Webmd.com/drugs. (Last visited Feb. 28, 2006.)

go to bed around 10 o'clock but that she usually falls asleep around 1:30 or 2:00 a.m. She lays in bed and reads. She has not asked her doctor for a more effective sleeping aid. Her inability to sleep is not triggered by any upsetting event and is unpredictable. (Tr. 350-51.)

Plaintiff testified that she experiences tremors in her hands, knees, and head, and that they make it difficult for her to write and hold small objects. She also testified she has mood swings twice a week. She testified she is unable to concentrate on anything, and does not read when she is unable to concentrate. She testified she does not read as much as she used to and not as well. She must wear glasses when she reads. (Tr. 352-54.)

Plaintiff testified that when she was going through her last divorce, she had a problem using drugs. She sometimes gets panic attacks two or three times a month. She has learned what triggers them and, if she removes herself from that situation and calms down alone, she can avoid them. (Tr. 354.)

Plaintiff testified that she drank alcohol about two weeks before the hearing. She sometimes drinks a beer to help her go to sleep.

## C. Testimony of the Vocational Expert

At the hearing held on May 28, 2003, Vocational Expert John McGowan testified that plaintiff's work as a cashier was considered light work as done in the national economy. Plaintiff's job at BHA as a sonic welder is medium work and semi-skilled.

When asked whether there were any jobs that existed that a person with plaintiff's age, education and work experience, who was limited to uncontrollable shaking in her upper extremities and would need to sit down or stand as needed in a low stress environment, the VE answered that there were jobs that such a person could do, but that she would need special treatment or placement. (Tr. 51.)

When asked if that same person was determined to have no ability to relate to coworkers, deal with the public, use judgment, deal with stress, interact with supervisors, function independently, maintain attention and concentration, maintain personal appearance, or behave in an emotionally stable way, would there be any work that person could do, the VE answered that such a person would be rare. But, if such a person

could not do all of those things, there would be no work he or she could do.  (Tr. 52-53.)

The VE also testified that a person with a GAF of 50 would usually not be able to work.  (Tr. 53.)

VE John McGowan also testified at the March 8, 2004 hearing.  When asked to assume a hypothetical individual of plaintiff's age, education and work experience, and that the individual could lift 20 pounds occasionally, and 10 pounds frequently, could stand, walk, or sit for six hours in an eight-hour workday, and could occasionally climb ladders, ropes, and scaffolds, and was limited in her ability to perform fine manipulation but not gross manipulation, and that this person had no mental limitations, the VE testified that such a person could do plaintiff's previous work at Wal-Mart, but could not do her previous work at BHA.  Plaintiff could do the previous work at Wal-Mart as it is described in the Dictionary of Occupational Titles.  (Tr. 361.)

When asked if that same individual was limited to simple or repetitive work, he stated she would be precluded from the Wal-Mart job, but that there were other jobs such an individual could do.  He testified there were around 2,000 hand packaging and filling jobs in 19 Missouri counties that she could perform.  If the individual was limited to sitting, there were 500 jobs.  (Tr. 362-63.)

McGowan noted that, based on Dr. Tinker's report, and Lori Byrd's opinion that plaintiff had a GAF of 50, such a person would be precluded from employment, or that finding such employment would be "very, very restrictive."  If such a person had no ability to handle work stress or deal with supervisors, there would be no jobs she could do.  (Tr. 364-66.)


**D. Decision of the ALJ**

In a December 3, 2004, decision denying benefits,[18] the ALJ noted that the Appeals Council had asked that further consideration be given to the opinion of Dr. Cohen.  The ALJ explained that the opinions of Dr. Cohen were inconsistent with other substantial medical evidence on the record, including other reports from Dr. Cohen, and other objective

---

[18]The ALJ had previously denied benefits on June 20, 2003. Plaintiff appealed this decision to the Appeals Council, who remanded the matter back to the ALJ for further consideration.  (Tr. 57, 72-75.)

medical evidence from other physicians on the record that failed to reveal signs of any disabling physical condition. The ALJ determined that the inconsistencies in the record supported his decision to afford Dr. Cohen's opinion little weight. (Tr. 15-16.)

The ALJ also noted that the Appeals Council wanted further consideration to be given to whether plaintiff had a severe physical impairment. The ALJ found that no doctor had found anything wrong with her neck until December 2003, and plaintiff had not sought treatment for it. She did not use strong pain medication, and had no physical therapy for her neck. The ALJ found this indicated she had never complained of pain in her neck, and, therefore, had no severe impairment. The ALJ found the record lacked any examination of her foot that showed a severe impairment. The ALJ found that no doctor had diagnosed plaintiff with arthritis, and only one said she had "possible" arthritis. The ALJ found that plaintiff did not have tendinitis, because she had no recent diagnosis of it; and did not have a stomach disorder, because she was only advised to avoid fatty or spicy foods and had received no treatment. The ALJ found that plaintiff's diagnosis of hyperthyroidism did not significantly limit her abilities to do work related duties. The ALJ found that plaintiff did suffer from carpal tunnel syndrome, overuse disorder, and intention tremors. (Tr. 16.)

The Appeals Council also wanted the ALJ to further evaluate plaintiff's mental condition. The ALJ found that, after "[g]iving the claimant much benefit of doubt" plaintiff did suffer from depression and anxiety. But the ALJ found that these disorders minimally limited her daily activities, and what limits she did place on her daily activities she alleged were due to physical problems. Plaintiff also had mild limitations of social functioning. Dr. Moccia noted plaintiff was polite and cooperative, and she often went to church, visited with friends, and often took another friend to appointments and shopping. (Tr. 17.)

The ALJ noted that plaintiff did not have problems with concentration, persistence, or pace. She reported reading books and magazines, and examiners noted she was alert and oriented. (Tr. 17.)

The ALJ gave little weight to the opinions of counselor Lori Byrd, who was not a health care professional, nor of Dr. Gutierrez, whom the ALJ found not to have treated plaintiff for an extended period of time.

The ALJ noted that evidence on the record failed to support their opinions. (Tr. 18.)

The ALJ noted that the Appeals Council found that the ALJ should determine whether substance abuse was a contributing factor to her determination of disability. The ALJ found that this issue was moot, since he had found that plaintiff was not disabled. The ALJ did find that there was evidence of a substance abuse problem and that it might affect her ability to do work-related activities. (Tr. 18.)

The ALJ found that plaintiff had not engaged in substantial gainful employment since her alleged disability onset date. He found that she had severe impairments of carpal tunnel syndrome, overuse disorder, intention tremors, and has been diagnosed with depression and anxiety. The ALJ found that plaintiff had the RFC to lift 20 pounds occasionally, and 10 pounds frequently. Plaintiff could sit, stand, and walk for six hours. Plaintiff could occasionally climb, was limited in her ability to perform fine manipulation, but has no limitation on her ability to perform gross manipulation. Plaintiff was limited to simple, repetitive work. The ALJ found that this RFC was consistent with Dr. Runde's evaluation and Dr. Tinker's treatment notes. (Tr. 19.)

The ALJ found that plaintiff's subjective complaints were not fully credible. the ALJ found that the objective medical evidence did not support her complaints, she sought no treatment in 2002, she required no extensive hospitalizations, and she performed her daily activities, including caring for animals, attending public events, and reading. (Tr. 19-20.)

The ALJ found that plaintiff could not perform her past relevant work, but that there were jobs in significant numbers in the national economy that she could do. (Tr. 20-21.)

## II. Discussion

### A. General Legal Framework

The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the

Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir. 2003). So long as substantial evidence supports the final decision, the court may not reverse it merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-41, (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a determination or decision is made and the next step is not reached; if no such determination can be made, the analysis goes to the next step. 20 C.F.R. § 404.1520(a)(4).

## B. Mental RFC

Plaintiff's sole argument is that the ALJ did not properly determine her mental residual functioning capacity. Plaintiff argues that the ALJ improperly discredited the opinions of Lori Byrd and Dr. Gutierrez and gave too much weight to the opinion of Dr. Stuve, a consulting physician who did not examine plaintiff. (Doc. 16.)

When determining whether a plaintiff's mental condition renders her disabled within the definition of the Social Security Act, the ALJ must first document in the decision signs, symptoms, and findings to determine whether a mental impairment exists. 20 C.F.R. §§ 404.1520a(b)(1); 416.920a(b)(1); Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997). If an impairment is found, the ALJ must then "rate the degree of functional loss resulting from the impairment in four areas deemed essential to work: activities of daily living; social functioning; concentration, persistence or pace; and deterioration or decompensation in work or work-like settings." Jones, 122 F.3d at 1153, n.5; 20 C.F.R.

§§ 404.1520a(c)(3); 416.920a(c)(3). On the scale used to rate them, these functional limitations are either extreme, marked, moderate, mild, or none. 20 C.F.R. §§ 404.1520a(c)(4); 416.920a(c)(4).

Here, the ALJ complied with the process for evaluating mental impairments, and concluded plaintiff's mental impairment did not satisfy the criteria for disability. (Tr. 16-18.) The ALJ found that plaintiff stated she had a nerve disorder and panic attacks, and that she had been diagnosed with depression and anxiety. Plaintiff took prescription medication for her symptoms but had not seen a mental health professional for an extended period of time. (Tr. 17.)

The ALJ found that plaintiff was only mildly limited in her daily activities. This determination is supported by substantial evidence. Plaintiff did laundry, cleaned, cooked, gardened, and took care of animals with help. (Tr. 166, 168, 260.) She took care of her personal care, wore makeup, and often changed her hairdo. (Tr. 259, 299.) Further, as the ALJ noted, most of plaintiff's limitations on her daily activities stemmed from her physical complaints, not mental disorders. (Tr. 17.)

The ALJ also found that plaintiff had mild limitations in social functioning, and this decision is also supported by substantial evidence on the record. Plaintiff often chatted in internet chat rooms with others. She sustained a relationship with her boyfriend, whom she lived with, and took him to appointments, to the grocery store, and to see his probation officer. (Tr. 260.) She went shopping and transported her children as needed. (Tr. 260.) Plaintiff also appeared cooperative at many doctor's visits. (Tr. 259.) There is substantial evidence on the record that plaintiff was only mildly limited in her social functioning.

The ALJ determined that plaintiff's limitations of concentration, persistence, or pace were moderately limited. Plaintiff reported being able to read books, magazines, and newspapers. (Tr. 168, 347.) She demonstrated good concentration, memory, and ability to follow directions during her evaluation by Dr. Moccia. (Tr. 260.) This is substantial evidence supporting the ALJ's decision that she was moderately limited in this area. The ALJ further found there was no evidence on the record that plaintiff required any psychiatric hospitalization, and therefore had no episodes of decompensation. (Tr. 17-18.)

Since the ALJ's decision that plaintiff is moderately limited in concentration, persistence, and pace, the ALJ's decision that plaintiff could perform simple, repetitive tasks is not in error. The Eighth Circuit has held that a person with moderate limitations in persistence, pace, or concentration might be able to perform simple, repetitive tasks. Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2000); Brachtel v. Apfel, 132 F.3d 414, 421 (8th Cir. 1997).

Plaintiff also argues that the ALJ erred by discrediting the opinions of Lori Byrd and Dr. Gutierrez when determining plaintiff's mental limitations. (Doc. 16 at 20-24.) When determining the RFC, "[t]he opinions of the claimant's treating physicians are entitled to controlling weight if they are supported by and not inconsistent with the substantial medical evidence in the record." Stormo, 377 F.3d at 805. "Such opinions are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." Id.; Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). "By contrast, '[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'" Singh, 222 F.3d at 452 (quoting Kelley v. Carnahan, 133 F.3d 583, 589 (8th Cir. 1998)). The ALJ must set forth his reasons for the weight given to a treating physician's assessment. Singh, 222 F.3d at 452.

Here, the ALJ's reasons for discrediting the opinions of Lori Byrd and Dr. Gutierrez were lawful. The ALJ was not required to give Lori Byrd, a social worker, the same weight as a treating physician. The ALJ may consider her opinion as a medical source, but the ALJ's failure to give her opinion the weight of a treating physician is not in error; Byrd is not a physician, but is instead a counselor. The ALJ may consider other medical evidence to determine what weight to give to Byrd's opinion. See Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005). The ALJ accurately determined that Byrd's opinion was not consistent with other medical evidence.

The ALJ noted that Dr. Gutierrez only treated plaintiff from March until May 2003, and concluded that this treatment period was too short to afford the opinion of Dr. Gutierrez the weight usually attributed to that of a treating physician. 20 C.F.R. §§ 416.927(d)(2)(I); 404.1527(d)(2)(I) ("Generally, the longer a treating source has treated

you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."); <u>Randolph v. Barnhart</u>, 386 F.3d 835, 840 (8th Cir. 2004). Regardless of the opinions of Dr. Gutierrez and Byrd, the record supports the ALJ's decision that plaintiff was only mildly limited in her daily activities and social functioning, and moderately limited in concentration, persistence and pace.

## C.  Plaintiff can perform other work

The ALJ found that plaintiff could not perform her past relevant work. Therefore, he went to Step 5. There he determined that plaintiff could perform other work in the national economy. This finding is supported by substantial evidence which is described above. The ALJ posed to the Vocational Expert a hypothetical question which contained the limitations and abilities of the plaintiff's RFC which the ALJ determined were true, which the law requires. <u>Long v. Chater</u>, 108 F.3d 185, 188 (8th Cir. 1997).

RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have until March 17, 2006, to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 5, 2006.

-22-